

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | CRIMINAL ACTION NO.: 3:21-294-MGL-1 |
| | § | |
| JONATHAN XAVIER MILLER, | § | |
| Defendant. | § | |

---

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO SUPPRESS**

---

## I.    INTRODUCTION

Pending before the Court is Defendant Jonathan Xavier Miller's (Miller) motion to suppress. Miller asks the Court to suppress evidence seized during a search of a home in which he claims to have been a resident (the residence). Having carefully considered the motion, the response, the oral argument, the record, and the applicable law, it is the judgment of the Court Miller's motion will be granted.

## II.    FACTUAL AND PROCEDURAL HISTORY

The Court determines the following facts by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

At about 4:00 A.M. on November 9, 2019, two Irmo Police Department officers, Sergeant David Dechman (Dechman) and Corporal Shirley (Shirley) (whose first name is uncontained in the record) arrived at the residence to perform a welfare check on Marquita Wiggins (Wiggins) and her children. They had received a call from someone purporting to be Wiggins's estranged husband, stating that Wiggins's new partner, who turned out to be Miller, had a gun and that he had been unable to reach Wiggins and his children since 10:00 P.M. the previous evening.

Upon their arrival, the officers noted that someone turned off a light as they approached. After they knocked, Wiggins eventually opened the door. She told the officers she was at home with her husband and children. She was wearing just a t-shirt and her underwear, so after talking to the officers for a few minutes, she asked if she could go put some clothes on, and the officers agreed.

When she returned, she spoke with the officers outside and told them Miller had a gun in his backpack. She gave the officers permission to search the home. She noted that Miller knew the officers were there. The officers proceeded to a bedroom where Miller was, apparently asleep. Dechman briefly exited the room and then returned.

Dechman asked Miller if there was a firearm in the bedroom; he told them there was not. Dechman then left the room to speak with Wiggins about the firearm before returning. Dechman asked his name, if he was a convicted felon, and if he could have a firearm. Miller told Dechman his name, that we was a convicted felon, and that he was prohibited from having a firearm. Dechman then asked Miller if he would mind if he searched the room, to which Miller said that he did mind.

2

Dechman again left the room to confirm with Wiggins that it was her home and that he had consent to search. Dechman returned and the officers then placed Miller in handcuffs. Dechman told him they were doing this because he "d[id]n't know what's going on here right now[,]" Dechman Body Camera Footage, although he told Miller he was not under arrest. Dechman then left to speak with Wiggins and again confirm that she gave consent to search.

Dechman returned and asked for Miller's identification, and Miller said that it was in his pants, but he was withholding permission to search. Dechman responded that they could search everything in the home based on Wiggins' consent. Miller reiterated his own lack of consent, but Dechman insisted the belongings were in Wiggins' house. Dechman asked Miller his name and date of birth, which Miller provided.

Dechman asked Miller his marital status and whether he was married to Wiggins. Miller insisted they were legally married. Dechman left to ask Wiggins, who said Miller was her boyfriend and they were not legally married.

When Dechman returned, Dechman also asked where Miller lived. Miller told him he lived in Blythewood, but that he had just moved his things to Wiggins' home that day. Miller again insisted they got married in Richland County on September 11, 2019, he could show the officers the wedding video, and that they could look up their marriage license online. Dechman refused, stating he mistrusts anything on the internet. The Richland County website, however, does show a record of Miller and Wiggins's marriage on that date.

Dechman told Miller "something's not adding up" and once again left to speak with Wiggins. Dechman Body Camera Footage. At that point, Wiggins told Dechman the marriage had been annulled. She stated he was on house arrest in Blythewood, and had followed her and her daughter home from school.

3

Wiggins also told him, after the officers had been at the home for about twenty-minutes, that Miller had threatened her that evening, and that Miller had pulled a gun on her before. She stated she had told her "ex-husband" about the threats earlier that evening.

Dechman asked dispatch whether he had pending state charges. Before receiving an answer, he returned to the bedroom and asked Miller if he was on house arrest. Miller told Dechman he was no longer on house arrest because his lawyer had "gotten it situated for [him]." Dechman Body Camera Footage.

Nevertheless, Dechman searched the backpack. Inside the backpack was several packages of drugs, but no firearm. Officers arrested Miller and removed him from the scene. Then, they continued to search the home, eventually finding a firearm and additional drugs in the closet adjoining the bedroom where Miller had been sleeping.

A grand jury thereafter indicted Miller for felon in possession in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and (e); possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime; as well as several other counts irrelevant to this motion. Miller filed this motion to suppress, to which the government responded. The Court subsequently held a hearing. At the hearing, Dechman testified. Miller declined to call any witnesses.

After hearing Dechman's testimony and argument from the government and Miller, the Court took the matter under advisement. The Court, having been fully briefed on the relevant issues, will now adjudicate the motion.

III.    STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV.

"It is 'a basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation omitted). The presumption of unconstitutionality that accompanies "the [warrantless] entry into a home to conduct a search or make an arrest" may be overcome only by showing "consent or exigent circumstances." *Steagald v. United States*, 451 U.S. 204, 211 (1981).


IV.    DISCUSSION AND ANALYSIS

A.    *Whether the Court should suppress the evidence found in Miller's backpack*

1.    *Whether the exigent circumstances exception applies in this case*

Miller contends the officers lacked exigent circumstances to search his backpack. On the other hand, the government insists the information that Miller was in a room with a firearm created exigent circumstances.

The exigent circumstances exception has been extended to various circumstances where law enforcement officers are responding to an emergency and there is a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). Such emergencies must be "enveloped by a sufficient level of urgency[.]" *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013). The Fourth Circuit has explained courts should consider, among any other applicable factors,

> "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband"

to determine "whether exigency reasonably justified a warrantless search." *Id.* (quoting *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981)).

At least one other circuit has held domestic violence cases fail to "create a *per se* exigent need for warrantless entry." *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004). An officer's conjecture about the possibility of future harm has also been held to be insufficient to establish exigent circumstances. *See United States v. Struckman*, 603 F.3d 731, 744 (9th Cir. 2010) (explaining that the court must make an objective inquiry into the reasonableness of the officer's conduct). Rather, to justify a search on these grounds, the officer must point to specific and articulable facts demonstrating the harm is imminent. *Id*. at 743.

In this case, the *Turner* factors weigh against a finding of exigency. First, the degree of urgency is low, because there was nothing to indicate any harm to those at the residence was imminent. In fact, it appears that, before the officers arrived, the occupants of the home had been sleeping. No one at the home had contacted the police that evening. No harm had befallen anyone in the household between 10:00 P.M., when the 911 caller had spoken to Wiggins and the children, and 4:00 A.M., when the officers arrived. That he was unable to reach the occupants of the house in the middle of the night—when they were likely sleeping—is unsurprising.

And, when the officers arrived, Wiggins asked them to wait outside while she returned inside to get dressed. Even though Wiggins told the officers Miller had threatened her, her behavior belied imminent danger sufficient to create exigent circumstances.

Second, there is no evidence to suggest Miller planned to remove or destroy any contraband, or that the officers reasonably believed he was planning to do so.

Third, the situation presented no abnormal danger to the police officers. Miller was noncombative, nonthreatening, and generally cooperative. He answered the officers' questions and provided his identity information. He readily divulged he was a convicted felon and disallowed from having a firearm. That he refused to consent to the search fails to indicate any danger to the officers. Although the caller and Wiggins told the officers Miller had a gun, there was no sign he had it accessible to him, or that he planned to use it.

Fourth, there is no evidence Miller knew police were "on [his] trail[,]" *Yengel*, 711 F.3d at 397, before they arrived. The caller had been absent from the residence that evening. There is no reason to believe Miller knew he had contacted the police. And, Miller was apparently sleeping before the police entered his bedroom, indicating he was unaware they were coming. Although Wiggins indicated Miller knew the police were there before they entered the bedroom, the Court is unconvinced of this based on the video. And, in any event, even if Miller realized the police had arrived, this factor weighs against exigency overall.

Fifth, the suspected contraband, a firearm, was not readily destructible. Therefore, the officers had time to obtain a warrant and return to conduct the search.

Finally, as Miller argues, the government's insistence upon the existence of exigent circumstances is contradicted by the lack of urgency displayed by the officers. For example, Officer Dechman left the bedroom where Miller was six times before conducting the search of the backpack. And, the time from the officer's arrival until they conducted the search was about twenty-five minutes. Although the officers insist they were ensuring they had authority to

conduct the search, this extra time taken—without incident—underscores the lack of imminent danger.

In sum, the police arrived at the residence in the early morning, when the occupants were sleeping or in bed. Any perceived emergency by the 911 caller—who had spoken with the occupants nearly six hours previously—had dissipated. The officers lacked a reasonable belief exigent circumstances existed. The exigent circumstances exception to the warrant requirement, then, is inapplicable.

### 2.     Whether the consent exception applies in this case

The government maintains that, even if the officers lacked exigent circumstances, they had consent to search the home. Miller insists the consent was invalid because he was a present co-occupant withholding consent. The issue is whether Miller was a co-occupant of the home.

Ordinarily, a co-occupant of a residence can give consent to search where that individual shares common authority over the property to be searched. *See United States v. Matlock*, 415 U.S. 164, 171 (1974). When, however, two co-occupants are physically present and one withholds consent to the search, then the warrantless search is unpermitted by the consensual exception to the warrant requirement and the evidence seized must be suppressed. *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006).

Miller and Wiggins were validly married, according to the marriage license record on Richland County's website. And, when the officers first arrived and asked Wiggins who was present at the residence, she responded that her husband and kids were there. Dechman even asked her to confirm that she had said her husband. Moreover, Wiggins at certain points referred to the caller as her "ex-husband." Yet, Dechman refused to verify that information, even considering Wiggins' inconsistent responses to his questions regarding their relationship.

Although Miller had lived at the residence for only one night, as defense counsel points out, there is always a first day.  Miller had moved his belongings to the house, indicating an intent to stay and live there.

And, he could not have started to live there before that day because he had been on house arrest at his former residence in Blythewood.  He moved in with Wiggins immediately upon dismissal of those state law charges.  That Miller stated he had a residence in Blythewood fails to undermine this—the officers were asking questions to verify his identity, so it makes sense that he might provide the address likely to be on file.

The Court holds Miller was a co-occupant of the residence and thus could withhold consent to search.  In the absence of exigent circumstances, and in the face of such uncertainty, the officers reasonably should have taken the time to verify Miller and Wiggins' marital status and residence and obtain a search warrant before conducting the search.  Thus, no exception to the warrant requirement applied in this instance.

The search of the backpack, therefore, was unconstitutional, and the Court will suppress the evidence found there.

### B.     *Whether the Court should suppress evidence obtained after Miller's arrest*

Miller contends, because his arrest was based upon an unlawful search, any evidence obtained after his arrest must also be suppressed.  The government insists the rule in *Randolph* allows only present co-occupants to withhold consent to search, and thus Wiggins had authority to give such consent after Miller was removed.

In *Randolph*, the Supreme Court suggested the requirement that a co-occupant applies only "[s]o long as there is no evidence that the police had removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection."  547 U.S. at 121.  In the

9

Supreme Court's subsequent decision in *Fernandez v. California*, 571 U.S. 292, 302 (2014), it clarified that this "*Randolph* dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead refer to situations in which the removal of the potential objector is not objectively reasonable." *Id.*

Taken together, *Randolph* and *Fernandez* indicate that if a co-occupant is removed from the premises due to an unlawful arrest, the rule requiring an objector's presence no longer applies. *Cf. Fernandez*, 571 U.S. at 302 ("[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason.").

Indeed, but for the officers' unlawful conduct in searching Miller's backpack and then arresting him, he would have been present in the home to continue his objection to the search. This holding is consistent with the reasonableness pillar of the Fourth Amendment. *See Riley v. California*, 573 U.S. 373, 381 (2014) (explaining that "the ultimate touchstone of the Fourth Amendment is reasonableness." (internal quotation omitted)).

Accordingly, because this Court determined above Miller's arrest was based on an unlawful search, the Court must suppress evidence obtained after his arrest as well.

## V.     CONCLUSION

Wherefore, based on the foregoing discussion and analysis, it is the judgment of the Court Miller's motion to suppress, ECF No. 63, is **GRANTED**.

**IT IS SO ORDERED.**

Signed this 17th day of October, 2022, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE